# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| JAMES FERGUS RASMUSSEN,<br><br>       Plaintiff,<br><br>vs.<br><br>JANA HACKER, N.P. and WARDEN<br>JIM MCKINNEY,<br><br>       Defendants. | No. C12-3078-MWB<br><br>***REPORT AND RECOMMENDATION<br>ON DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT*** |

_____

## I.       INTRODUCTION

Plaintiff James Fergus Rasmussen, an inmate in Iowa's state prison system, commenced this lawsuit on October 12, 2012. He then filed a *pro se* complaint on February 8, 2013. Rasmussen alleges the defendants were deliberately indifferent to his medical condition of Dupuytren's contractures[1] while he was an inmate at the Fort Dodge Correctional Facility (FDCF). He seeks both short and long-term medical treatment at the University of Iowa Hospitals and Clinics (UIHC) at the expense of the Iowa Department of Corrections (DOC), including but not limited to surgery and medication.

Defendants have filed an answer in which they deny Rasmussen's claim. Doc. No. 11. No party has demanded a jury trial. Defendants have now moved for summary judgment. (Doc. No. 18). Rasmussen has not filed a resistance. Judge Bennett referred the motion to me for the preparation of a report and recommended disposition. No party

---

[1] According to information provided by Rasmussen from the Mayo Clinic website, Dupuytren's contracture is "a hand deformity that usually develops slowly, over decades." Doc. No. 6 at 13. It affects the connective tissue under the skin of the palm causing knots of tissue to form which eventually develop into a thick cord pulling one or more fingers into a bent position. *Id.*

has requested oral argument and, in any event, I find that oral argument is not necessary. *See* N.D. Ia. L.R. 7(c).  The motion is fully submitted.

## II.  RELEVANT FACTS

Unless otherwise noted, the following facts are undisputed for purposes of defendants' motion:

***The Parties.***  Rasmussen was committed to the custody and care of the Iowa prison system for a second time on June 3, 2011.  He was incarcerated at FDCF from July 21, 2011, through November 13, 2013, when he was transferred to the North Central Correctional Facility (NCCF) in Rockwell City, Iowa, where he is currently incarcerated. Defendant James McKinney is the Warden of FDCF and defendant Jana Hacker is a nurse practitioner at FDCF and NCCF.

***Rasmussen's Treatment History.***  A physical exam was completed on Rasmussen in June 2011 when he came into the custody of the DOC.  At that time, medical staff took note of his Dupuytren's contractures on his 5th digits bilaterally.  Rasmussen reported a history of contractures on his hands and feet for the past 10 years.  His feet had started to contract two years ago and his left hand had recently started to contract. The contractures were worse on his right hand and he had multiple hard masses along his tendons.  He also reported pain around his knuckles.  In addition, Rasmussen was diagnosed with Seizure Disorder, Type II Diabetes Mellitus, Gastroesophageal Reflux Disease, Benign Prostatic Hypertrophy, Chronic Obstructive Pulmonary Disease and Hypertension.  Medical staff recommended daily stretching and massage options to slow the progression of his contractures and explained that surgery was elective at that time and would most likely not be performed while he was in prison depending on the condition's progression.

While at FDCF, Rasmussen first complained of his hands on June 1, 2012.  He stated that his hands were getting worse and more fingers were starting to contract.  He

presented information from the Mayo Clinic website indicating that surgery was a treatment option for his condition. Rasmussen saw Hacker on June 5, 2012, for his contractures and demanded to be sent somewhere for treatment. Hacker recommended keeping his fingers warm and doing stretching exercises. She also discussed the progression of the disease with him.

Rasmussen reported to health services again on June 11, 2012, claiming the contractures were now affecting his penis and throat. Rasmussen requested surgery to release the tendons as described in the Mayo Clinic information. Hacker indicated that she would present Rasmussen's case to the DOC medical review committee to determine if anything further should be done. The case was presented on July 24, 2012. The committee determined it was not medically indicated to refer Rasmussen to UIHC for his Dupuytren's contractures. Hacker informed Rasmussen of the committee's decision and noted no intervention would be necessary until the contractures were severe or interfered with his activities of daily living.

On August 21, 2012, Hacker performed an annual physical exam on Rasmussen. She noted he had partial contracture of the 5th digits on both hands and mild contracture of the 4th digits. He had no difficulty with activities of daily living and no contractures of the toes. Rasmussen next reported to health services on November 15, 2012, complaining of pain in his knuckles and expressing concern that his contractures were now occurring in his face and head. The nurse reassured him that Hacker was aware of his condition and he could speak to her about his concerns at his next scheduled appointment. The treatment notes from his next appointment with Hacker do not indicate that he complained of his contractures at that time.

On June 3, 2013, Rasmussen asked to speak to nurse Karen Anderson. He stated Hacker had documented inaccurate information about his hands at his last appointment and that he wanted surgery. He asked her to change what was documented. Anderson told him she could not change the record, encouraged him to do the stretching exercises Hacker recommended and suggested he raise his concerns at his next scheduled

appointment. At that appointment on August 19, 2013, Hacker performed a physical and noted his contractures were stable and unchanged and that Rasmussen performed activities of daily living without problems.

At an appointment on November 8, 2013, Hacker noted that there had been no progression of Rasmussen's Dupuytren's contractures and that he was still able to perform activities without problems, including his job at the facility. The condition was also stable in his feet. He had no problems ambulating, no pain and he was able to exercise.

*The Grievance Process.* Rasmussen filed an emergency grievance on June 1, 2012, stating he had attempted to resolve the issue informally and wanted to see a hand specialist. His grievance was processed as a standard grievance and denied on June 5, 2012, because he had been seen by Hacker who had explained the prognosis and treatment for his condition. Rasmussen filed an appeal on June 6, 2012. His appeal was denied over a year later on July 11, 2013, for having not followed the proper procedures. The notice stated that prison officials were "[t]rying to clean up grievance processing screen" and "due to not having information from the warden to complete and submit we are submitting without the needed information." Rasmussen did not appeal further.

Meanwhile, Rasmussen had filed a new grievance on July 26, 2012, stating he had attempted to resolve the issue with Hacker informally and still wanted to see a specialist regarding his Dupuytren's contractures. His grievance was denied because Hacker had presented Rasmussen's case to the medical review committee, which determined it was not severe enough to refer Rasmussen for surgery. Rasmussen did not appeal this grievance. He filed a third grievance on January 16, 2013. It was denied for the same reasons and Rasmussen did not appeal. Rasmussen filed his fourth grievance on June 5, 2013, stating he had attempted informal resolution with Karen Anderson and accused Hacker of inaccurately documenting his symptoms. His grievance was denied. Rasmussen appealed on June 8, 2013. His appeal was denied on June 12, 2013, by the Deputy Warden, who stated:

> I have reviewed your Grievance. Mr. Rasmussen, I rely on our Nurse Practitioner to assess your medical needs while at FDCF. It's my understanding that you saw Ms. Anderson, Nurse Supervisor, on 6/3/2013. Ms. Anderson explained to you our process and discussed your situation with you for awhile. We do not like to see you in pain. Medical staff is providing you with what they think are [sic] adequate treatment based on your current situation/diagnosis.

Rasmussen appealed to the Central Office on June 17, 2013. His appeal was denied on June 20, 2013, as follows:

> I have reviewed the Grievance Officer and Deputy Warden response to your grievance issue. I have also asked the DOC Medical Director to review your grievance issue. You are receiving the appropriate treatment for your medical condition. It is important that you follow all of the doctor's orders pertaining to all of your health issues. If you fail to follow order's [sic] for one of your health issues it can cause issues with another health issue. Grievance appeal denied.

Rasmussen commenced this case on October 12, 2012. Doc. No. 1. He brings his claim pursuant to 42 U.S.C. § 1983 and alleges the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. His complaint states that he has pain in both hands and feet and in his jaw. Doc. No. 6 at 7. He contends that he cannot extend some fingers and that the tendon in his jaw is also affected such that he bites it when eating, causing constant pain, breakage of skin and bleeding. *Id.* He claims Warden McKinney never responded to his appeal dated June 5, 2012. He seeks short and long-term treatment at UIHC at DOC expense, including, but not limited to, surgery and medication.

## III.    *SUMMARY JUDGMENT STANDARDS*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element

of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## IV.     ANALYSIS

Defendants raise four separate arguments in seeking entry of summary judgment:

a.     There is no evidence that they were deliberately indifferent to a serious medical need.

b.     Plaintiff's claims are barred by 42 U.S.C. § 1997e(a).

c.     Defendant McKinney is not liable based on respondeat superior principles.

d.     The defendants are entitled to qualified immunity.

### A.     Were Defendants Deliberately Indifferent to a Serious Medical Need?

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban against cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To prevail on such a claim, an inmate must show "that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the

need yet deliberately disregarded it." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the first requirement, an objectively serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991)). Under the second requirement, an official is deliberately indifferent "if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Id.* "Deliberate indifference is equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub*, 638 F.3d at 914-15 (quoting *Farmer*, 511 U.S. at 835, 839-40).

With regard to the first requirement, Rasmussen alleges that his Dupuytren's contractures constitute an objectively serious medical need. Defendants do not dispute this, but disagree with his suggestion that surgical treatment is required at this time. Because both parties agree that Dupuytren's contractures constitute a serious medical need that requires treatment, I find that the evidence is sufficient to support a finding that Rasmussen meets the first requirement.

The second requirement is subjective, meaning that Rasmussen must put forth evidence demonstrating a factual issue as to whether defendants acted with a "sufficiently culpable state of mind, namely, that they actually knew of, but deliberately disregarded [Rasmussen's] medical needs." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (internal citations and quotations omitted). The evidence must show "that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Id.* (emphasis in original). To put it another way, deliberate indifference occurs when an official "knows that an inmate faces a substantial

risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Schaub*, 638 F.3d at 916 (citing *Farmer*, 511 U.S. at 847).

Rasmussen alleges that the defendants acted recklessly in response to his serious medical need by failing to refer him to UIHC. Defendants argue that Rasmussen's disagreement with the course of medical treatment is an insufficient basis to establish a constitutional violation. *See Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (dismissing inmate's deliberate indifference claim where inmate alleged he suffered from kidney stones but multiple medical tests revealed no such condition); *Sherrer v. Stephen*, 50 F.3d 496, 497 (8th Cir. 1994) (holding that inmate's desire for a replacement joint instead of fusion surgery was "merely a disagreement with the course of medical treatment and does not state a constitutional claim."). They contend there is no evidence to suggest they provided improper or untimely treatment for Rasmussen's contractures that would constitute deliberate indifference.

Hacker presented Rasmussen's case to the DOC medical review committee on July 24, 2012. The committee was comprised of Dr. Harbons Deol, the DOC's Medical Director, and all other physicians within the DOC. The committee reviewed Rasmussen's case and determined it was not medically indicated to refer Rasmussen to UIHC for his Dupuytren's contractures at that time. Hacker noted that intervention was not required until the contractures were severe or Rasmussen was unable to perform activities of daily living. Doc. No. 18-3 at 34. She recommended stretching exercises and keeping his fingers warm. Doc. No. 18-3 at 21.

The evidence in this record is insufficient to generate a genuine issue of material fact as to whether Hacker or McKinney acted or failed to act with the requisite culpable state of mind. There is simply no evidence to support a finding that they "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Krout*, 583 F.3d at 567. Although such knowledge can be demonstrated through circumstantial evidence where, for instance, the medical need is so

obvious that a reasonable person would know that the inmate needed medical attention, Rasmussen's evidence fails to allow this inference. Indeed, the only evidence he has provided is the information from the Mayo Clinic website. That information suggests Dupuytren's contractures do not present a substantial risk of harm and, at most, can make it difficult to perform certain functions that require the use of one's hands. Doc. No. 6 at 15.

Here, the undisputed evidence shows that Hacker and the medical staff at FDCF were fully aware of Rasmussen's condition. Rasmussen has presented no evidence from any medical source indicating that it was negligent, let alone reckless, for Hacker to proceed as she did in treating his Dupuytren's contractures. Rasmussen's evidence from the Mayo Clinic website indicates surgery is one of several treatment *options*. It states that "[i]f the disease progresses slowly, causes no pain and has little impact on your ability to use your hands for everyday tasks, you may not need treatment." Doc. No. 6 at 16. It further recommends treating mild cases with (a) stretches, (b) massage and heat and (c) use of protection when performing heavy grasping tasks. *Id.* at 17.

This was essentially Hacker's conclusion. She checked Rasmussen's hands during physical exams and noted that the condition had affected his 5th digits and was mildly affecting his 4th digits, but that Rasmussen was able to perform everyday tasks without difficulty. Her recommended treatment of stretching and keeping his fingers warm is consistent with Rasmussen's Mayo Clinic information. Further, Hacker referred Rasmussen's case to the DOC medical review committee. Their review confirmed Hacker's findings that further treatment or intervention was unnecessary until Rasmussen's contractures became severe or interfered with his activities of daily living. Rasmussen has not alleged that he is unable to perform everyday activities. Physical exams indicate that the condition is only affecting the 5th digits and the 4th digits, mildly, at this time.

"[A] prisoner's mere difference of opinion over matters of expert medical judgment of a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (quoting *Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992)). "[A] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Pietrafeso v. Lawrence Cnty.*, 452 F.3d 978, 983 (8th Cir. 2006) (internal quotations and brackets omitted). Here, the record does not contain sufficient evidence to suggest that Hacker or McKinney "actually knew of and disregarded a substantial risk of serious harm to [Rasmussen's] health or safety." *Farmer*, 511 U.S. at 844. Based on this record, Rasmussen has not demonstrated a genuine issue of material fact as to whether defendants were deliberately indifferent to a serious medical need. I recommend entry of judgment in defendants' favor as a matter of law.

This recommendation, if adopted, would likely dispose of the entire case. Nonetheless, and in the alternative, I will address the defendants' other summary judgment arguments.

**B.** **_Is Rasmussen's Claim Barred by 42 U.S.C. § 1997e(a)?_**

Section 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). If a claim is not exhausted, the district court must dismiss it. *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

Defendants argue that Rasmussen failed to exhaust his administrative remedies because he did not follow the proper grievance procedure for his complaints. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from

system to system and claim to claim, but it is the prison's requirements . . . that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). The Eighth Circuit has excused inmates from complying with grievance procedures when "officials have prevented prisoners from utilizing the procedures, . . . or when officials themselves have failed to comply with the grievance procedures." *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005).

The DOC's grievance policy at the relevant time required inmates to attempt an informal resolution of the grievance before filing a written grievance. The inmate then had to file a grievance complaint using a form. Only one issue could be raised per form. Within seven days, the grievance officer would notify the inmate of receipt of the grievance and the process to be used (standard, emergency, non-grievable or other). Within 21 days of receiving the grievance, the grievance officer would provide a written response and recommendation or otherwise notify the inmate that the investigation was continuing. If the inmate wished to appeal that decision, he was required to complete a form. This appeal form had to be received by the warden/superintendent within 15 days of the grievance officer's response. The warden/superintendent would respond in writing within 15 days. If the inmate was still not satisfied with the response, he then had to submit an appeal form to the regional deputy director. The form had to be received within 15 days of the warden/superintendent's response. The regional deputy director would then respond within 30 days, which constituted the final appeal step.

Defendants contend that Rasmussen did not appeal his grievance properly prior to filing this case. The only grievance he filed and completely exhausted (by appeal to the regional deputy director at the Central Office) was the one he filed on June 5, 2013. The Central Office denied his appeal on July 3, 2013. Rasmussen filed this case on October 12, 2012. Defendants argue dismissal is mandatory due to Rasmussen's failure to exhaust his administrative remedies before filing his case. *See Johnson*, 340 F.3d at 627 ("If exhaustion was not completed at the time of filing, dismissal is mandatory.").

The record indicates that Rasmussen's initial grievance dated June 1, 2012, was denied by the grievance officer on June 5, 2012, and Rasmussen appealed to the warden/superintendent on June 6, 2012. Doc. No. 18-3 at 82-84. Rasmussen did not receive a response from the warden/superintendent until July 11, 2013. Doc. No. 18-3 at 87. That response, while titled "Warden Appeal Response," did not come from the warden/superintendent, instead listing the grievance officer as the person responding. The response itself indicates that his grievance was denied for not having followed the proper procedure and states:

> Trying to clean up grievance processing screen and talked with [the grievance officer] and due to not having information from the warden to complete and submit we are submitting without the needed information.

*Id.* Defendants offer no explanation for this vague, untimely response.

All of Rasmussen's subsequent grievances were filed before he finally received the "Warden Appeal Response" to his first grievance. Doc. No. 18-3 at 89-105. While he did not appeal the denial of his second or third grievances, he did appeal the denial of his fourth grievance to the Central Office, with that appeal being denied on July 3, 2013. *Id.* at 95-105. Viewing the facts in the light most favorable to Rasmussen, the officials at FDCF failed to follow the proper grievance procedure. The warden/superintendent did not respond to Rasmussen's initial appeal until over a year after it was filed, contrary to the FDCF grievance policy's requirement that a written response be submitted within 15 days. When prison officials fail to comply with grievance procedures, inmates are excused from complying with the exhaustion requirements. *See Gibson*, 431 F.3d at 341. Therefore, I do not recommend entry of summary judgment against Rasmussen based on 42 U.S.C. § 1997e(a).

*C.*     *Can McKinney Be Held Liable Based on Respondeat Superior?*

"[S]upervisors are not liable for [E]ighth [A]mendment claims brought under section 1983 on a respondeat superior theory." *Choate*, 7 F.3d at 1376 (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)).  Supervisors can only be liable based on (a) their personal involvement in a constitutional violation or (b) when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices.  *Id.* (citations and quotations omitted).  "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye [to it]."  *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002)

McKinney cannot be held liable under the doctrine of respondeat superior nor under either of the other theories noted above.  McKinney's "general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability."  *Camberos*, 73 F.3d at 176.  It is not even clear whether McKinney had notice of Rasmussen's condition, as (a) the late response from Rasmussen's first appeal listed the grievance officer as the response person and (b) Mike Kane, the Deputy Warden, responded to Rasmussen's other appeal.  Moreover, McKinney is not a medical professional and generally cannot be personally liable for medical staff's treatment decisions.  *Webb v. Hedrick*, 409 Fed. Appx. 33, 36 (8th Cir. 2010).  Indeed, Kane's response states "I rely on our Nurse Practitioner to assess your medical needs while at FDCF."  Doc. No. 18-3 at 100.  Because McKinney was not personally involved with Rasmussen's medical treatment, he can only be held liable if he had "a reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating) [Rasmussen]."  *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008).

Rasmussen has not put forth any evidence suggesting that McKinney had knowledge that Rasmussen's Dupuytren's contractures required further treatment at UIHC.  Because there is insufficient evidence to demonstrate a genuine issue of material

fact as to whether McKinney was deliberately indifferent to Rasmussen's serious medical need, I recommend entry of judgment in his favor as a matter of law on this additional, alternative basis.

**D.     *Are Defendants Entitled to Qualified Immunity?***

Finally, defendants argue Rasmussen's claim must be dismissed because they are entitled to qualified immunity.   Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   The doctrine balances (a) the need to hold public officials accountable when they exercise power irresponsibly with (b) the need to shield officials from harassment, distraction and liability when they perform their duties reasonably.   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (citation and internal quotation marks omitted).

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).   The analysis consists of two inquiries:

> 1.     Do the facts alleged or shown make out a violation of a constitutional right?
>
> 2.     Was that right clearly established (from the perspective of a reasonable official in the defendant's position) at the time of the alleged conduct?

*Pearson,* 555 U.S. at 232; *see also Irving v. Dormire,* 519 F.3d 441, 446 (8th Cir. 2008). A public official is entitled to qualified immunity unless the answer to both questions is "yes." *Pearson,* 555 U.S. at 232.   While federal courts were once required to address these two inquiries sequentially, they are now "permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Thus, when appropriate, a court may skip the first inquiry and find that qualified immunity exists based on a finding that the alleged constitutional right was not "clearly established" at the time of the alleged conduct. *Id.*

I have already determined that Rasmussen has failed to demonstrate a genuine issue of material fact as to whether defendants were deliberately indifferent to a serious medical need. Even if a constitutional violation occurred, however, Rasmussen would have to show that the right he is claiming was clearly established at the time of the alleged conduct. Whether a right is "'clearly established' is a question of law for the court to decide." *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009). "For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The relevant question "is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Rohrbough*, 586 F.3d at 586 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Rasmussen, of course, has a clearly-established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment. However, qualified immunity will apply only if it would have been clear to a reasonable officer that the actions or inactions Rasmussen complains of were unlawful under the circumstances. This does not necessarily mean that the precise actions had to have been declared unlawful by prior court decisions. *See, e.g., Atkinson v. City of Mountain View*, 709 F.3d 1201, 1212 (8th Cir. 2013) (citing *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001)). It does mean, however, that prior decisions must have provided "fair warning" that the actions were unconstitutional. *Id.* (citing *Meloy*, 302 F.3d at 848).

Rasmussen claims that he has a right to surgical and other short and long-term treatment at UIHC for his Dupuytren's contractures. Courts have found that failure to

send an inmate to a specialist can amount to deliberate indifference where "the need for . . . referral to a medical specialist is obvious." *See Self v. Crum*, 439 F.3d 1227 (10th Cir. 2006) (stating, as an example, where a doctor knows that the patient needs delicate hand surgery requiring a specialist but performs the operation himself). As discussed above, however, the record here does not establish an obvious need for further treatment. Rasmussen has not complained that his contractures prevent him from performing everyday tasks and has only occasionally complained of knuckle pain. Moreover, the medical review committee determined his contractures were not severe and did not interfere with his daily tasks such that surgical or other treatment at UIHC was necessary. Even if it could be determined that failure to send Rasmussen to UIHC for further treatment amounted to deliberate indifference, the right to that particular form of treatment under these circumstances was not so clearly established that a reasonable officer would know he or she was acting unlawfully by failing to arrange for such treatment. *See Davis*, 375 F.3d at 712 ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.").

Rasmussen's claim fails both prongs of the qualified immunity analysis. This provides another alternative basis for me to recommend the entry of summary judgment in favor of the defendants.

## V. CONCLUSION AND RECOMMENDATION

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the defendants' motion for summary judgment (Doc. No. 18) be **granted**, that this case be **dismissed with prejudice** and that **judgment be entered** in favor of the defendants and against the plaintiff.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts

of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 7th day of May, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE